COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| | § | No. 08-11-00138-CV |
| | § | |
| | § | Appeal from the |
| IN THE MATTER OF J.R.C.S., | § | |
| A JUVENILE, | | 65th District Court |
| | § | |
| | | of El Paso County, Texas |
| | § | |
| | | (TC#10,00990) |
| | § | |

## **O P I N I O N**

Appellant J.R.C.S. ("J.R.C.S."), a minor, appeals the Juvenile Court Referee's Order of Adjudication finding that J.R.C.S. engaged in delinquent conduct by committing the offense of felony Criminal Mischief. He also appeals the Juvenile Court's Disposition placing J.R.C.S. on probation until his 18th birthday, ordering J.R.C.S. to pay restitution in the amount of $50,000, and ordering his parents to pay $25,000 in restitution. J.R.C.S. raises five issues: (1) the evidence was legally insufficient to justify the order of adjudication of delinquency; (2) error in the determination of damages under Texas Penal Code § 28.06(a) and (b); (3) the State failed to prove each and every point in its petition; (4) abuse of discretion by the trial court in assessing a disposition; and (5) abuse of discretion in ordering the juvenile's parents to pay restitution. For the reasons that follow, we affirm.

## **BACKGROUND**

The State filed a Petition Based on Delinquent Conduct alleging that J.R.C.S. committed the offense of Criminal Mischief causing pecuniary loss in the amount of $20,000 or more but less than $100,000. A trial was held on March 25 and 28, 2011.

On July 14, 2010, the playground at Ramona Elementary School ("Ramona") in El Paso, Texas was set on fire, destroying and damaging the playground equipment. Arturo Ruiz ("Ruiz") was working at Ramona on the day of the fire. When he arrived at work that day, he noticed that the playground was undamaged. Later, as he was working in Room 140, he saw fire and smoke coming from the playground. Ruiz testified that he saw two juveniles running away from the flames toward a park, but he did not see their faces, and did not see anyone else near the fire. Ruiz called 911 and then went outside to open the gates for the fire truck.

Belen Fonseca ("Fonseca") testified that she was working at Ramona on July 14, 2010 when she saw two boys playing with a skateboard head toward the park prior to the fire. She noticed that one of the boys had curly green hair, but was unable to identify J.R.C.S. as the boy she saw that day.

Gloria Cortez ("Mrs. Cortez") testified that on July 14, 2010 she and her family were driving home from the El Paso Zoo when she noticed a "fire like a bonfire" on the playground at Ramona. She then noticed two boys jogging away from the fire. She recognized J.R.C.S. as one of the boys running from the fire and identified him to the jury. She and her husband told the boys to stop and she and her husband prevented them from leaving. She also noticed that they had been filming the fire with a cell phone. While she was at the scene, Mrs. Cortez saw the boys give the cell phone to J.R.C.S.'s mother, and Mrs. Cortez identified her as the same woman sitting in the courtroom with J.R.C.S. Mrs. Cortez identified a photograph depicting J.R.C.S. and another boy

2

sitting on skateboards with their backs to the camera. The photograph was admitted into evidence.

Tony Cortez ("Mr. Cortez") testified that he, Mrs. Cortez, and their children were returning from the El Paso Zoo when he saw a fire at the Ramona playground, and asked Mrs. Cortez to dial 911. As he approached Ramona from North Loop Street, he saw two boys running toward a fence. Mr. Cortez stopped his car, stopped the boys, then checked the playground and found no one else present. At trial, Mr. Cortez identified J.R.C.S. as one of the two boys he stopped running away from the fire.

Eric Sodermann ("Sodermann"), an arson investigator for the El Paso Fire Department, testified that he investigated the playground fire at Ramona on July 14, 2010. He attempted to walk around the burning area, but the melted tire material (used as ground chips for the playground) "was in a tar-type state" and made it too difficult to traverse. He described the playground as "almost a complete burn." He also met with Mr. and Mrs. Cortez at the scene. Sodermann returned to the playground two days later to continue his investigation and to determine the origin and cause of the fire. Sodermann testified that he found part of a disposable lighter. He also looked underneath the main platform of the playground and determined that the fire originated under the platform because the supporting posts had melted, "telling [him][the fire] burned hotter in that area and longer in that area, so they melted and it collapsed."

On July 21, 2010, Sodermann visited J.R.C.S.'s home and met with his mother, Norma Castro ("Ms. Castro"). Sodermann asked her if he could have the cell phone that was in her son's possession. Ms. Castro went back into the house and returned with the cell phone, a black Samsung, which was later entered into evidence. Sodermann obtained a search warrant to access

any electronic data on the phone pertaining to the playground fire. The phone was submitted to the FBI office in El Paso. The FBI was able to retrieve several still photographs of a fire: the first was an image of a fire on the Ramona playground; the second photo showed paper being added to the fire; the third showed the fire getting bigger. Later, Sodermann found two videos on the phone showing a fire growing in size. The audio portion was translated by a court interpreter from Spanish to English for the jury. The translation included the following: "Go, go, go, go;" "it smells like shit, man;" "we ought to do this when it's cold man. Put more paper in it, yeah, man."

At trial, Sodermann was shown several exhibits. Exhibits One through Eight were identified as accurate depictions of the state of the Ramona playground as Sodermann initially witnessed it. Sodermann affirmed that the boy wearing the black shirt in Exhibit 16 was J.R.C.S. and identified J.R.C.S. as one of the suspects at the center of his investigation. Sodermann identified the cell phone, admitted as State's Exhibit Seventeen, as the cell phone he obtained from J.R.C.S.'s mother which contained photos of a fire and two videos of a fire increasing in size. The photographs were admitted as State's Exhibits Eighteen through Twenty, and a DVD of the videos was admitted as State's Exhibit Twenty-One. Sodermann admitted on cross-examination that the lighting of paper does not necessarily mean that someone is trying to start a fire, and that he did not see anything that was intended specifically to try and burn down the playground. He also admitted that the structural steel posts had paint damage but were otherwise intact. In response to the defense's question "You saw no specific intent to damage this playground, did you, sir?" Sodermann replied "no."

Roberto Luna, Jr., ("Luna") was a maintenance supervisor for the Ysleta Independent School District ("YISD"). He was employed as an Environmental Service Technician for YISD

4

at the time of the fire handling "any type of hazards that occur[ed] in the school district." Luna responded to the fire at Ramona, but by the time he arrived the playground was completely burned. Luna identified Exhibits One through Eight as the remains of the playground.

Luna testified that, as part of his job, he had become familiar with playgrounds and the structures surrounding them, and had handled playground fires before. He stated that the playgrounds at all the YISD elementary schools were similar; that the cost to replace other playgrounds was around $100,000; but that the bid to replace the Ramona playground was $75,000. Luna further testified that the playground equipment is similar, but not the same, in all schools because newer equipment would have a different model number. Luna testified that the entire playground could not be repaired and had to be replaced. Luna admitted that he did not know how long the playground had been in place and that he did not know how much depreciation had occurred to the playground equipment. Luna admitted that he did not prepare the purchase orders himself. Instead, he prepared the request for the purchase orders, which were then handled by the purchasing department. The juvenile referee took the admission of the purchase orders under advisement, but ultimately the purchase orders were not admitted into evidence.

Bernice Madrid ("Madrid"), a secretary for YISD's Environmental Services Department, testified that as part of her job she is responsible for the inventory and purchasing of school equipment, and is the custodian of records. She processed the quotes and handled the purchase orders for the replacement of the Ramona playground. She identified State's Exhibit Eleven, a memorandum to the associate superintendent of finance showing the replacement cost of the playground as $75,153.04, and Exhibits Twelve through Fifteen (purchase orders for replacement

5

and clean-up of the playground), which were admitted into evidence. She testified that she had no knowledge regarding the value or depreciation, if any, of the Ramona playground equipment.

The principal of Ramona Elementary School, Anna Silva, testified that Exhibits Twenty-three and Twenty-four accurately depicted the playground before the fire. She also testified that she remembered when the original playground was installed, it had slides, monkey bars, and "was quite extensive." She testified that she received a call that the playground was burning and arrived at the school after the fire had been extinguished. She identified J.R.C.S. as one of the juveniles at the scene when she arrived.

Following a two day trial, the jury found that J.R.C.S. had engaged in delinquent conduct. An Order of Adjudication was signed on March 28, 2011. On April 19, 2011, a Disposition hearing was held.

Gabriela Salazar ("Ms. Salazar"), a juvenile probation officer, testified at the hearing regarding the probation department's home study and recommendation. Ms. Salazar testified that, in her opinion, J.R.C.S.'s parents had not contributed to his delinquency. She further testified that, other than the adjudicated offense, J.R.C.S. was not in need of rehabilitation. However, she later testified that he was in need of rehabilitation to deal with his "poor judgment and the adjudicated offense." Ms. Salazar stated that she did not know anything specific about the offense and was unaware of the video admitted during the trial. Ms. Salazar testified that: (1) J.R.C.S. lived with his family and siblings in the El Paso's lower valley; (2) his parents reported that they do not encounter any behavior problems with him; (3) his parents could provide the proper control and supervision for him; and (4) he was attending high school and doing well. She stated that because of the adjudicated offense, she thought counseling was necessary. Ms. Salazar

6

then testified that J.R.C.S. was in need of rehabilitation because "he needs to be held accountable" for his offense. She stated that the Positive Achievement Change Tool ("PACT") assessment she prepared showed J.R.C.S. at a low risk to reoffend and that only four of the eighteen areas showed risk factors.

The court found J.R.C.S. in need of rehabilitation and that the protection of the public and the juvenile required a disposition.

Following the Disposition hearing, the juvenile referee placed J.R.C.S. on probation until his 18th birthday; ordered J.R.C.S. to pay restitution in the amount of $50,000; and ordered his parents to pay restitution in the amount of $25,000. J.R.C.S. timely appealed.

## DISCUSSION

J.R.C.S. brings five issues: (1) the evidence was legally insufficient to justify the order of adjudication of delinquency; (2) error in the determination of damages under Texas Penal Code § 28.06(a) and (b); (3) the State failed to prove each and every point in its petition; (4) abuse of discretion by the trial court in assessing a disposition; and (5) abuse of discretion in ordering the juvenile's parents to pay restitution. J.R.C.S. asserts that his first three issues are related and argues them as one issue, and similarly groups Issues Four and Five.

## Adjudication of Delinquency

J.R.C.S. contends that the evidence was legally insufficient to justify the order of adjudication of delinquency. He argues that the State presented: no testimony showing the fair market value ("FMV") of the destroyed playground equipment; no testimony as to why FMV could not be used for the damage calculation; and the evidence made no distinction made between equipment that was "destroyed" versus "damaged." Finally he asserts that the State's petition

7

listed specific playground equipment, but no evidence was presented that the Ramona playground included the listed equipment and that those pieces were replaced or repaired.

## Standard of Review

Although juvenile appeals are categorized as civil cases, we use the same standards applicable in criminal appeals when reviewing challenges to the sufficiency of the evidence supporting a finding that a juvenile engaged in delinquent conduct. *See In re D.R.T.*, 339 S.W.3d 208, 209 (Tex.App.--El Paso 2011, no pet.); *In re H.G.G.D.*, 310 S.W.3d 43, 45 (Tex.App.--El Paso 2010, no pet.); *In re M.D.T.*, 153 S.W.3d 285, 287 (Tex.App.--El Paso 2004, no pet.). The legal-sufficiency standard is the only standard a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex.Crim.App. 2010); *see also Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979). Accordingly, we review the evidence under the *Jackson* standard. *See D.R.T.*, 339 S.W.3d at 210.

Under *Jackson*, we review "the evidence in the light most favorable to the prosecution" to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2789. This standard gives full play to the responsibility of the trier of fact in resolving conflicts in testimony, weighing the evidence, and drawing reasonable inferences from basic to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2789. As a reviewing court, we do not resolve any conflicts of fact or re-evaluate the weight and credibility of the evidence. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim.App. 2000); *In re H.G.G.D.*, 310 S.W.3d at 46. Instead, our role is to determine whether both the

8

explicit and implicit findings made by the trier of fact are rational by viewing all of the evidence admitted at trial in a light most favorable to the verdict. *Adelman v. State*, 828 S.W.2d 418, 422 (Tex.Crim.App. 1992). If the record supports conflicting inferences, we presume that the fact finder resolved any inconsistencies in favor of the verdict and defer to that determination. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007); *Curry v. State*, 30 S.W.3d 394, 406 (Tex.Crim.App. 2000). The same standard of review is applicable for both direct and circumstantial evidence cases. *Geesa v. State*, 820 S.W.2d 154, 158 (Tex.Crim.App. 1991), *overruled on other grounds, Paulson v. State*, 28 S.W.3d 570 (Tex.Crim.App. 2000).

### Elements of Criminal Mischief and Amount of Pecuniary Loss

A person commits the offense of criminal mischief if, without the effective consent of the owner, he intentionally or knowingly damages or destroys the tangible property of the owner. TEX.PENAL CODE ANN. § 28.03(a)(1)(West 2011). A person acts intentionally when it is his conscious objective or desire to cause the result; he acts knowingly with respect to the nature of his conduct when he is aware that his conduct is reasonably certain to cause the result. TEX.PENAL CODE ANN. § 6.03(a), (b)(West 2011). Proof of a culpable mental state almost invariably depends upon circumstantial evidence and may be inferred from any facts tending to prove its existence, including the acts, words, and conduct of the accused. *Hart v. State*, 89 S.W.3d 61, 64 (Tex.Crim.App. 2002); *see also Beltran v. State*, 593 S.W.2d 688, 689 (Tex.Crim.App. 1980).

Pertinent to this case, an offense is a felony of the third degree if the amount of the pecuniary loss is $20,000 or more but less than $100,000. TEX. PENAL CODE ANN. § 28.03(b)(5). If property is destroyed, the amount of pecuniary loss is (1) the fair market value of the property at the time and place of the destruction; or (2) if the fair market value cannot be

9

ascertained, the cost of replacing the property within a reasonable time after its destruction.

TEX.PENAL CODE ANN. § 28.06(a)(1) and (2).   If the property is damaged, the amount of

pecuniary loss is the cost of repairing or restoring the damaged property within a reasonable time

after the damage occurred.   TEX.PENAL CODE ANN. § 28.06(b).

## Application

J.R.C.S. first argues that there is legally insufficient evidence to support the adjudication of

delinquency.   We disagree.

The State, in its petition, charged J.R.C.S. as follows:

> [O]n or about July 14, 2010, and anterior to the presentment of this petition, in the
> County of El Paso, and State of Texas, the said [J.R.C.S.], did then and there
> intentionally or knowingly damage and destroy tangible property, to-wit:   a
> playground, to include: canopy, slides, seesaw, cabanas, silo climber, 6 foot arch
> bridge, 'S' tube slide, 4 foot oval crawl tube, rumble seat, sonic slide, balcony,
> tic-tac-toe activity wall, accessible solar system panel, rubber chip ground cover
> and assorted play stations and rock wall, by fire, without the effective consent of
> ANA SILVA, the owner, and did thereby cause a pecuniary loss in the amount of
> $20,000 or more but less than $100,000, in violation of Section 28.03 of the Texas
> Penal Code.[1]

Investigator Sodermann testified on cross-examination the lighting of paper does not

necessarily mean that someone was trying to light something else on fire, and that he did not see

anything indicating a specific intent to burn down the playground.   However, J.R.C.S. was

apprehended by Mr. Cortez fleeing the scene of the fire and was identified by both Mr. and

Mrs. Cortez.   Mrs. Cortez testified that the boys had been filming the fire with a cell phone.

Mr. Cortez testified that he, Mrs. Cortez, and their children were returning from the El Paso Zoo

---

[1]  The petition and jury charge require proof that J.R.C.S. did "damage and destroy" property, using the conjunctive.
However, proof of either "damaging" or "destroying" the property supports a conviction for criminal mischief.   *See*
*Sepulveda v. State*, 751 S.W.2d 667, 668 (Tex.App.--Corpus Christi 1988, pet. ref'd); *Adams v. State*, 222 S.W.3d 37,
48 (Tex.App.--Austin 2005, pet. ref'd)(noting same).

when he saw a fire at the Ramona playground, and asked Mrs. Cortez to dial 911.   As noted earlier, the cell phone, which was in J.R.C.S.'s possession, contained photographs and videos of a fire starting and growing.   There was no evidence that J.R.C.S., who was at the scene of the fire, called 911 or otherwise reported the fire or asked for help.   Instead, J.R.C.S. was observed fleeing the scene.   Each of the facts recited herein support an inference that J.R.C.S. intended to damage or destroy the playground.   In other words, the circumstantial evidence supports an inference that J.R.C.S. was aware that his conduct was reasonably certain to cause the result.   *See* TEX.PENAL CODE ANN. § 6.03(a), (b).

Viewing the evidence in the light most favorable to the verdict, and presuming that the fact finder resolved any inconsistencies in the evidence in favor of the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that J.R.C.S. intentionally or knowingly damaged or destroyed the Ramona playground.   J.R.C.S.'s first issue is overruled.

**Pecuniary Loss**

In his second and third issues, J.R.C.S. argues that the State failed to establish the requisite pecuniary loss necessary to support the judgment and that the State failed to prove each and every element in its petition.

Under the Texas Penal Code, an "owner" of property is defined as a person who "has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor . . . ."   TEX.PENAL CODE ANN. § 1.07(a)(35)(West Supp. 2012).   This is the definition of "owner" utilized in the jury charge in the instant case.   The court's instruction defined "possession" as "actual care, custody, control or management of the property," which is the definition of "possession" in TEX.PENAL CODE ANN. § 1.07(a)(39).   The Court of

11

Criminal Appeals has recognized that the "owner" of property may testify as to the value of the property and such testimony has been held sufficient to determine value. *See Sullivan v. State*, 701 S.W.2d 905, 909 (Tex.Crim.App. 1986). In *Sullivan*, the Court of Criminal Appeals held:

> [W]hen the owner of the property is testifying as to the value of the property, he or she may testify as to his or her opinion or estimate of the value of the property in general and commonly understood terms. Testimony of this nature is an offer of the witness' best knowledge of the value of his property. Such testimony will constitute sufficient evidence for the trier of fact to make a determination as to value based on the witness' credibility. This is true even in the absence of a specific statement as to 'market value' or 'replacement value.'
>
> When an owner testifies, the presumption must be . . . that the owner is testifying to an estimation of the fair market value. Certainly the owner may reasonably be understood to be testifying as to the fair market value of the property either in terms of the purchase price or the cost to him of replacing the stolen property.

*Sullivan*, 701 S.W.2d at 909.

The Court of Criminal Appeals also held that an appellant must do more than impeach the witness' credibility. To rebut an owner's opinion evidence, an appellant "must offer controverting evidence as to the value of the property." *Id.*

Based on the definition of "owner" set out in the Texas Penal Code and recited in the jury charge, Anna Silva, the principal of Ramona Elementary, is considered an "owner." Luna and Madrid could also qualify as "owners," since they had a greater right of possession of the property at Ramona than J.R.C.S.. *See Lewis v. State*, 628 S.W.2d 276, 279 (Tex.App.--Amarillo 1982, no pet.)(store manager was "special owner" with greater right to possession of money than appellant); *Hudson v. State*, 675 S.W.2d 507, 510 (Tex.Crim.App. 1984)(security investigator for telephone company was "special owner" of damaged property, as he had greater right to possession than appellant). Their testimony regarding the value of the property replaced at Ramona Elementary is permissible under *Sullivan*.

12

Luna and Madrid's testimony was that the entire playground was destroyed and had to be replaced. On the other hand, Sodermann stated that the canopy poles were damaged but not destroyed, allegations not contained in the State's petition. In addition to the witness testimony, Exhibits One through Eight show the destruction of the playground. Luna testified that the bids to replace the Ramona playground were approximately $75,000. Madrid testified that the cost to replace the Ramona playground was $75,153.04. While J.R.C.S. cross-examined Luna, Madrid, and Silva as to depreciation of the playground equipment, he did not present any testimony or evidence regarding the value of the Ramona playground property. In other words, J.R.C.S. did not present any contravening evidence regarding the value of the Ramona playground. *See Sullivan*, 701 S.W.2d at 909.

Viewing all the evidence in the light most favorable to the verdict, we conclude that a rational juror could have believed the testimony and exhibits that the entire playground was destroyed and that the pecuniary loss to YISD was greater than $20,000 but less than $100,000. *Brooks*, 323 S.W.3d at 899. J.R.C.S.'s second issue is overruled.

J.R.C.S. also contends that the State did not make a distinction between property that was "damaged" and property that was "destroyed." However, the petition and jury charge in the instant case would permit the jury to determine J.R.C.S. delinquent whether he damaged *or* destroyed the playground. *See Sepulveda*, 751 S.W.2d at 668. J.R.C.S.'s argument that the State was required to distinguish between "damaged" and "destroyed" property is without merit, particularly in light of the testimony of Luna, Madrid, and Sodermann that the playground was destroyed.

J.R.C.S. asserts that the State did not prove each element of the petition, specifically, that

the State failed to prove the destruction of each item described in the petition:

> [A] playground, to include: canopy, slides, seesaw, cabanas, silo climber, 6 foot arch bridge, 'S' tube slide, 4 foot oval crawl tube, rumble seat, sonic slide, balcony, tic-tac-toe activity wall, accessible solar system panel, rubber chip ground cover and assorted play stations and a rock wall . . . .

At trial, the State presented testimony that the destroyed playground equipment included slides, shade structures, basic playground equipment for elementary school children, a jungle gym, swings, poles to climb on and up, poles to swing on, rubber chip ground cover (aka "tire media"), and shade canopies. Photographs showing the playground equipment before and after it was destroyed were introduced into evidence.

The Juvenile Justice Code does not contain a specific provision governing jury charges.[2] *In re A.A.B.*, 110 S.W.3d 553, 555-56 (Tex.App.--Waco 2003, no pet.). On appeal, juvenile delinquency proceedings are to be governed by the civil rules of appellate procedure as far as practicable. *In re D.I.B.*, 988 S.W.2d 753, 756 (Tex. 1999). However, juvenile delinquency proceedings are quasi-criminal in nature. *In re C.O.S.*, 988 S.W.2d 760, 765 (Tex. 1999). Texas Code of Criminal Procedure article 36.14 mandates that the trial court must charge the jury on the "law applicable to the case," which requires that the jury be instructed on each element of the offense charged. TEX.CODE CRIM.PROC.ANN. art. 36.14 (West 2007). *See also Dinkins v. State*, 894 S.W.2d 330, 339 (Tex.Crim.App. 1995)(because jury charge instructs jury on law applicable to case, it must contain accurate statement of law and set out all essential elements of offense). The elements of an offense are: "the forbidden conduct, the required culpability, any required result, nor does it create an exception to the offense." *Weaver v. State*, 87 S.W.3d 557, 561 (Tex.Crim.App. 2002). In criminal cases, a variance between a charging instrument and

---

[2] TEX. FAM.CODE ANN. Title 3 (West 2008 & Supp. 2012).

evidence adduced at trial has been held to constitute a legal sufficiency issue. *Gollihar v. State*, 46 S.W.3d 243, 257 (Tex.Crim.App. 2001). In juvenile proceedings, because the rules of civil procedure govern, a fatal variance between the pleadings and proof is determined by considering whether the variance is substantial, misleading, and prejudicial. *Matter of O.C.*, 945 S.W.2d 241, 243 (Tex.App.--San Antonio 1997, no writ).

J.R.C.S. argues that the State failed to prove damage or destruction to each item listed in the petition. Assuming without deciding that there is a variance between the State's petition and the evidence adduced at trial, J.R.C.S. does not describe how this variance is substantial, misleading, and prejudicial. There is no indication in the record that J.R.C.S. did not know what property he was accused of destroying or damaging or that he was surprised by the proof at trial. Moreover, J.R.C.S. does not allege that he was unable to prepare a defense because of any alleged variance. The petition sufficiently alleged that J.R.C.S. damaged or destroyed property, specifically a playground and identified the playground equipment. J.R.C.S.'s third issue is overruled.

## Disposition

J.R.C.S.'s fourth and fifth issues relate to his disposition. Essentially, he argues that the trial court abused its discretion by assessing a disposition when J.R.C.S. was not in need of rehabilitation, and abused its discretion when it ordered J.R.C.S.'s parents to pay restitution.

Section 54.04 of the Texas Family Code provides that a juvenile proceeding may consist of an adjudication hearing and a disposition hearing. TEX.FAM.CODE ANN. § 54.04(a)(West Supp. 2012). At the adjudication hearing, the court or jury must determine whether the juvenile has "engaged in delinquent conduct or conduct indicating a need for supervision . . . ."

15

TEX.FAM.CODE ANN. § 54.03(a)(West Supp. 2012).   If the trial court determines that a juvenile has engaged in delinquent conduct or conduct indicating a need for supervision, the court conducts a separate and distinct disposition hearing subsequent to the adjudication hearing. TEX.FAM.CODE ANN. §§ 54.03(a) & 54.04(a).   Unless the court or jury finds the child is in need of rehabilitation or the protection of the public or the child requires that a disposition be made, the court must dismiss the child and enter a final judgment without any disposition. TEX.FAM.CODE ANN. § 54.04(c).   If the trial court finds that the child is in need of rehabilitation or that the protection of the public or of the child requires a disposition, it may place the child on probation.   *In re J.V.M.*, 318 S.W.3d 444, 448 (Tex.App.--El Paso 2010, no pet.).

In a juvenile case, the trial court possesses broad discretion to determine a suitable disposition of a child who has been adjudicated to have engaged in delinquent conduct.   *In re A.T.M.*, 281 S.W.3d 67, 70 (Tex.App.--El Paso 2008, no pet.), *citing In re A.S.*, 954 S.W.2d 855, 861 (Tex.App.--El Paso 1997, no pet.).   We do not disturb the juvenile court's findings absent an abuse of discretion.   *In re A.T.M.*, 281 S.W.3d at 70.   The juvenile court does not abuse its discretion merely because it decides a matter differently than the appellate court would have in a similar situation.   *Id.* at 71.   We apply a two-pronged analysis to determine an abuse of discretion:   (1) did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion?   *Id.* at 70.   A traditional sufficiency of the evidence review helps answer the first question, and we look to whether the trial court acted without reference to any guiding rules or principles to answer the second.   *Id.*

Here, the trial court determined that a disposition was necessary to protect J.R.C.S. and the public.   J.R.C.S. argues that because Ms. Salazar's testimony indicated that J.R.C.S. was not in

16

need of rehabilitation, the juvenile referee abused his discretion by disregarding her testimony and placing J.R.C.S. on supervised probation.

Ms. Salazar testified that the recommendation of the Juvenile Probation Department was that J.R.C.S. be placed on supervised probation with a 5 p.m. curfew until his eighteenth birthday, because the juvenile was in need of rehabilitation. She admitted that J.R.C.S. had no history of drugs or alcohol abuse, and that, apart from being tardy to class five times, he was "actually doing very well" in high school. Ms. Salazar testified that the home evaluation indicated that the home was suitable for rehabilitation and that his parents did not encounter any behavioral problems with J.R.C.S. She also testified that J.R.C.S. could benefit from cognitive skills counseling to address the poor judgment he exercised in committing the adjudicated offense. The PACT assessment, while indicating that J.R.C.S. had low risk factors for possibly reoffending, stated that J.R.C.S.'s "primary purpose for committing crime: Excitement, amusement, or fun." When asked by the trial court why he committed the offense, J.R.C.S. responded "I was not thinking correctly," and "I wasn't able to measure the consequences correctly." J.R.C.S. also admitted that he did not think of the consequences to either his family or to the children who would not be able to use the playground.

The trial court did not abuse its discretion by finding that J.R.C.S. was in need of rehabilitation based on his commission of the offense, his reason for committing the offense, and the fact that he had not yet received services to address his lack of judgment and impulsivity. We perceive no abuse of discretion in the trial court's determination that the public needed protection from a juvenile who caused $75,000 to a school playground for "amusement or fun." The court

17

had sufficient evidence to determine that a disposition was appropriate.[3]   J.R.C.S.'s fourth issue is overruled.

Finally, J.R.C.S. argues that the trial court abused its discretion when it ordered his parents to pay restitution in the amount of $25,000.   We conclude that we have no jurisdiction over this issue.

The Texas Family Code provides that the parents of a juvenile have their own appeal rights from a final juvenile court order.   *See* TEX.FAM.CODE ANN. § 61.004(a)(West 2008)("The parent or other eligible person against whom a final juvenile court order has been entered may appeal as provided by law from judgments entered in civil cases.").   Pursuant to this section, the parents' appeal from a Section 54.041(b) restitution order runs independent of the proceedings against the juvenile.   *See In re D.D.H.*, 143 S.W.3d 906, 907 n.1 (Tex.App.--Beaumont 2004, no pet.)(noting same).

Because a separate Section 54.041(b) restitution order was entered against J.R.C.S.'s parents, they were required to file their own, independent appeal of the restitution order.   *See* TEX.FAM.CODE ANN. § 61.004(a).   A review of this case establishes that the appeal was filed on behalf of J.R.C.S. only.[4]   His parents did not file a notice of appeal or give any indication that they were challenging the trial court's restitution order.   A timely filed notice of appeal is necessary to invoke this Court's jurisdiction.   TEX.R.APP.P. 25.1(b); *Lehmann v. Har-Con*

---

[3]   However, even if the evidence supporting such a finding is weak, Section 54.04(c) states that a disposition can be made, if the court finds that the juvenile is in need of rehabilitation or the protection of the public or of the child requires that a disposition be made.   TEX.FAM.CODE ANN. § 54.04(c).   Therefore, as the court found that the child was in need of rehabilitation, it is irrelevant whether the protection of the child or the public required a disposition.   *In re E.F.Z.R.*, 250 S.W.3d 173, 178 (Tex.App.--El Paso 2008, no pet.), *citing In re S.A.M.*, 933 S.W.2d 744, 745 (Tex.App.--San Antonio 1996, no pet.).

[4]   We note that J.R.C.S. does not challenge the restitution order as it applies to him.   Rather, he challenges it in relation to his parents.   S*ee In re D.D.H.*, 143 S.W.3d at 907.

*Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). Because no appeal was filed by J.R.C.S.'s parents, we do not have jurisdiction over J.R.C.S's fifth issue.[5]

## CONCLUSION

Having overruled J.R.C.S.'s first four issues and concluded that we have no jurisdiction over his fifth issue, the judgment of the trial court is affirmed.

December 19, 2012                                    CHRISTOPHER ANTCLIFF, Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.

---

[5] Had we concluded that J.R.C.S. had standing to address this issue on behalf of his parents, there was no abuse of discretion. In its judgment of probation, the trial court made a specific finding that J.R.C.S.'s parents "had not, by willful act or omission, contributed to, caused, or encouraged the Child's delinquent conduct . . . ." However, no express finding was made that J.R.C.S.'s parents had made a good faith effort to prevent the child from engaging in the delinquent conduct, which would allow the restitution to be waived. *See* TEX.FAM.CODE ANN. § 54.041(g). J.R.C.S. argues that his parents "couldn't be more different" than the parents in *In re D.M.*, 191 S.W.3d 381, 384 (Tex.App.--Austin 2006, pet. denied)(requiring restitution from parents where juvenile caused $100,000 in damages to school due to fire, and parents blamed school but did not recognize responsibility for juvenile's actions), and that Ms. Salazar testified that she did not believe they could have done anything differently to have prevented the incident. However, as noted in *In re D.M.*, the burden of showing a "good faith effort" to prevent the incident is not on the State, but rests with the parents. *Id.* at 388. The record before us does not set forth evidence to support a finding of "good faith." The law promotes the protection of property owners and provides compensation for them for the wilful and malicious destruction of their property by minors. *See In re D.K.*, 247 S.W.3d 802, 804 (Tex.App.--Dallas 2008, no pet.)(upholding restitution order against juvenile's parent, even though parent filed affidavit of indigency, where no evidence of inability to pay was presented at trial court and order served purposes of protecting owner of property). The trial court's ruling is more indicative of the statutory purposes of the Juvenile Justice Code, to protect the property owners, and to provide compensation for the destruction of the Ramona playground. J.R.C.S. also argues that because his parents earn less than poverty level, restitution would cause an undue hardship. The amount of restitution ordered in the instant case was not designed to cause hardship to J.R.C.S. or his family, but to compensate the victim, the Ysleta Independent School District, for the damages suffered due to the delinquent conduct. *See In re D.K.*, 247 S.W.3d at 804.

19