

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00156-CV

IN THE MATTER OF D.J.P.

-----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant D.J.P., a juvenile, appeals the trial court's order revoking his probation and sentencing him to an indefinite term of commitment with the Texas Juvenile Justice Department[2] (TJJD). In one issue, D.J.P. argues that the trial

---

[1]*See* Tex. R. App. P. 47.4.

[2]We note that the version of Texas Family Code section 54.05(m) that took effect December 1, 2013, replaces the term "Texas Youth Commission" with "Texas Juvenile Justice Department." *See* Tex. Fam. Code Ann. § 54.05(m) (West Supp. 2013). Because the trial court had already started using the new

court abused its discretion because it sentenced him without reference to any guiding rules or principles. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Probation

On December 19, 2011, the trial court found that D.J.P. had engaged in delinquent conduct and adjudicated him delinquent for the offense of burglary of a habitation that had occurred on or about September 27, 2011, and for the offense of evading arrest that had occurred on or about November 12, 2011. The trial court placed D.J.P. on probation for one year.

### B. Motions to Modify Disposition

In April 2012, the State filed a motion to modify disposition, alleging that D.J.P. had possessed a usable quantity of marijuana of two ounces or less on April 16, 2012. The State's motion requested that D.J.P. be placed in the custody of the TJJD. The trial court thereafter extended D.J.P.'s probation until April 19, 2013.

In August 2012, the State filed a motion to modify disposition, alleging that on July 17, 2012, D.J.P. had destroyed tangible property causing a pecuniary loss of $50 or more but less than $500. The State's motion requested that D.J.P. be placed in the custody of the TJJD.

term "Texas Juvenile Justice Department" in its order, which is dated before the change took effect, we will use that term in our opinion for the sake of consistency.

2

Also during August 2012, D.J.P.'s probation officer, Terri Coney, submitted a progress report to the court. Coney reported that D.J.P.'s mother (Mother) had called her several times during the week regarding D.J.P.'s negative behavior, which included not following Mother's rules and leaving the house without permission. Coney visited the home and requested a urine sample; D.J.P. tested positive for amphetamine and methamphetamine. D.J.P. admitted to Coney that he had gotten drunk during the previous week and had taken "Triple C's."[3] Coney reported that "until quite recently," D.J.P. had been noncompliant with the terms of his probation; although he had completed some of what he had been asked to do, he had continued to use drugs and alcohol and to do as he pleased. The trial court ordered D.J.P. to be put on electronic monitoring.

In October 2012, the State filed another motion to modify disposition, alleging that D.J.P. had destroyed tangible property causing a pecuniary loss of $50 or more but less than $500 and had failed to abide by his curfew on July 17, 2012. The State's motion requested that D.J.P. be placed in the custody of the TJJD.

In March 2013, the State filed its third motion to modify, alleging that D.J.P. had caused bodily injury to Mother by striking her with his hand on February 22, 2013. The State's motion requested that D.J.P. be placed in the custody of the

---

[3]This term is not defined or explained in the record.

3

TJJD. The State also filed a new petition related to this charge,[4] and the trial court thereafter held an adjudication hearing and a disposition hearing.

## C. Adjudication Hearing

At the adjudication hearing, Fort Worth Police Officer Spencer[5] testified that he had responded to a domestic disturbance call on February 22, 2013. Mother told him that she had gotten into an altercation with D.J.P.'s girlfriend, who had pulled Mother's hair. Mother said that D.J.P. had pushed her down and had held her down while his girlfriend hit Mother and that D.J.P. had punched Mother in the face as well. Mother was upset but coherent. Her lip was slightly swollen, and she had a small cut inside her upper lip and a cut on her finger.

Fort Worth Police Officer Andrew M. Jones testified that he had assisted Officer Spencer in responding to Mother's domestic disturbance call; he instructed Mother to write out her statement. The statement that Mother gave on the night of the incident is as follows:

> My son[']s girlfriend verbally threatened me and then it turned physical, punches were thrown[;] my son held me down while his girlfriend hit me[;] my son then also started to assa[ul]t me. He busted my lip and nose [and] bit my finger. He then took off running. The punches hurt[;] my lip is busted and hurts.

---

[4]The record from the adjudication hearing references this petition, but it is not found in the clerk's record.

[5]In the record, this officer is identified only as "Officer Spencer"; his first name is not provided.

4

Mother testified at the adjudication hearing that she has been living with her mother since she lost her job as a respiratory therapist three years ago. Mother described the household as chaotic because she has four children, including D.J.P. who is sixteen, a twelve-year-old son, a four-year-old daughter, and a three-year-old daughter. Mother said that there are three fathers for her four children and that two of the fathers are incarcerated, including D.J.P.'s father.

Mother testified that she got into an argument that escalated into a physical altercation with D.J.P.'s girlfriend on February 22, 2013. Mother fell and hit her head on a table, and when she went to stand up, D.J.P. and Mother's mother held Mother down. Mother told the police that she thought that D.J.P. had struck her. Mother recalled telling the police officer that D.J.P. had bitten her on the finger; she said that she thought he had bitten her and that she went to the hospital to have her finger examined. Mother testified that she was confused because her lip was busted, and so she thought D.J.P. had assaulted her. Mother testified that she had assumed that D.J.P. had hit her even though he had never been physical with her before and had never hit her.[6] Mother testified that she remembered parts of what transpired on February 22 but that

---

[6]Mother repeatedly testified that D.J.P. did not have a history of assaulting her, that he had never been physical with her before, that he had never been violent with her in any way, and that he had never hit her. Mother said that she did not recall texting D.J.P.'s probation officer Coney: "I need to speak to you ASAP. I'm in a movie. [D.J.P.] assaults me. I want him picked up. I've already filed charges. They won't pick him up."

"[e]verything happened so fast that, like I said, I automatically assumed it was [D.J.P.], but, you know, once we sat down, I dropped charges on [D.J.P.'s girlfriend] because we had a big talk about it, and come to find out, you know, I had hit my face on [D.J.P.'s] end table."

Mother agreed that maybe she did text Coney the following:

> [H]is little girlfriend started threatening me[,] and I told her she had to leave[,] and it escalated from there. She pulled my hair[,] and he held me down and started punching me in my face[,] and I found the weed[,] and he hid it and took off running because I was going to give it to the cops.

Mother admitted that in her text messages to Coney she had referenced the injuries to D.J.P.'s girlfriend's pulling her hair and D.J.P.'s hitting her in the face, which are the same injuries that Mother had noted on the family violence packet. Mother recalled that she had told Coney that D.J.P. had been selling "weed" and that he had a gun. Mother testified that she had automatically assumed that the marijuana was D.J.P.'s but that she had discovered it was not his.

Mother agreed that she had texted Coney that she could not testify against D.J.P. or she would lose her home. Mother testified that she did not want to pursue charges against D.J.P.

In order to explain the inconsistencies in Mother's statement and her trial testimony, D.J.P.'s attorney explained during his closing argument that he had attempted to show through his questioning that Mother had injured herself after she had suffered a seizure, even though she did not exhibit any physical signs and testified that she had not had a seizure since November 2012.

6

At the conclusion of the adjudication hearing, the trial court denied the petition but found that D.J.P. had violated his probation as alleged in the motion.

## D. Disposition Hearing

Following the conclusion of the adjudication hearing, the trial court held a separate disposition hearing. The trial court noted that D.J.P. was placed on deferred prosecution for committing the offense of "places weapons prohibited" in 2010. The trial court noted that D.J.P. had a marijuana case in 2011 that was not filed. On November 12, 2011, D.J.P. was referred to the juvenile court for committing the offenses of burglary of a habitation, evading arrest, criminal trespass, and possession of a prohibited substance in a correctional facility; he was adjudicated for burglary of a habitation and evading arrest and was ordered to perform community service, to participate in anger control classes, and to pay restitution. The trial court asked D.J.P. whether he had completed his community service hours, and D.J.P. said that he had completed that requirement but had paid only about half of the restitution.[7] D.J.P. said that he had not had steady employment for two or three months but that he was trying to find odd jobs to pay the restitution. He said that he was not attending school because the Can Academy had not allowed him to return due to this new case and that if he went

---

[7]The record from the disposition hearing includes unsworn statements made by D.J.P. and his mother in discussions with the court.

7

back to public school, he would lose all his credits from the Can Academy.[8]  He said that he is in tenth grade and that he has eight to ten credits.

Coney testified that the services offered to D.J.P. had included Family Preservation, community service, Project ASPECT, substance abuse treatment at TYRC as well as outpatient treatment, and the Victim Impact Panel.  Coney testified that D.J.P. had been on electronic monitoring twice[9] and had also been placed on intensive supervision probation.  Coney explained that D.J.P. had been placed on intensive supervision probation because when he was first placed on probation he was not available for visits, was not attending school, was not doing his community service hours, and "wasn't doing anything."  Coney said that D.J.P. did not start working towards what he needed to do until July after he had received a criminal mischief charge.  Coney testified that D.J.P. had received all of the services possible, other than one that was not appropriate because he does not have mental health issues.

Coney testified that D.J.P. is smart and could do well if he chose to.  But she agreed with the recommendation in the latest psychological evaluation by Altman Psychological Services, which recommended an increase in structure

---

[8]Mother testified that D.J.P. had been going to school regularly before he was detained and that the counselor at the Can Academy said that D.J.P. could not attend as long as he had a pending case.

[9]Two days after the November 12, 2011 evading arrest offense, the trial court had ordered electronic monitoring for D.J.P. pending court.

and supervision for D.J.P. because his problems have continued even though he has been supervised and redirected within the community.

The State asked for an indeterminate sentence at the TJJD, stating that Coney had exhausted the resources that are available in the community for D.J.P. and that reasonable efforts had been attempted to keep D.J.P. from being removed from his home.

The social history that Coney provided states that whenever she makes a home visit, the family is asleep, no matter what time of day it is. The social history states that D.J.P. told Coney that he does not see Mother as a mother and therefore does not feel he owes her the respect of a mother. According to Coney, Mother is not trustworthy as she often tells Coney one thing when she is angry with D.J.P. and then will backtrack.[10] Mother's mother allowed D.J.P.'s girlfriend to move into the house with them and gave D.J.P. a car that he drives, despite his not having a driver's license or auto insurance.[11] The social history

---

[10]The social history states that at the ten-day detention hearing in March 2013, Mother "could not say enough of how much she wanted [D.J.P.] home" and how well he was doing, but several days later, Mother left a voicemail for Coney stating that having D.J.P. at home is never going to work and that Coney needed to come take him to TJJD or "wherever." When Coney texted Mother the following day, she was back to saying that everything is fine.

[11]When the trial court asked D.J.P. whether his grandmother had given him the car that he was driving, he said that he was making payments for it. He admitted that he was not old enough to sign a contract and that he did not have a driver's license.

states that Mother is overwhelmed both financially, due to losing her job, and emotionally.

The social history revealed that during fall 2012, D.J.P. enrolled at Can Academy and did well in attendance and grades. He did not attend school at all the previous year; his family said that he was homeschooled, but when pressed for details, they admitted that he was not formally enrolled in any program.

The social history reveals that D.J.P. has a history of using alcohol, marijuana, ecstasy, and cocaine. He attended drug counseling and completed outpatient treatment. His February and March 2013 drug tests were negative. D.J.P. admitted to previously being the middle man in dealing drugs in the not too distant past but denied that activity occurred presently. D.J.P. admitted to associating with gang members.

The summary at the end of the social history states that D.J.P. was before the juvenile court for the third time and that this was his sixth referral to the probation department. The summary further states,

> [D.J.P.]'s mother says all the right things in court and to the Department, but she will lie and make excuses for him. When she is angry[,] she can't get him out of the house fast enough and gets very upset with this Officer and the Department when she believes [D.J.P.] is getting away with something. However, as soon as action is taken to hold him accountable, Mother retracts her complaints and will report everything is fine.

The final paragraph of the social history states,

> [D.J.P.] has been afforded numerous programs and extended supervision in the community; however, he continues to violate the law. [D.J.P.] is manipulative and seems to enjoy the manipulation

10

even more than the actual outcome. He does not respect his mother or others in authority, and displays an arrogant attitude that he is above it all. He plays games and will placate to others in order to get what he wants. At this time it appears that [D.J.P.] would benefit from a more structured environment than can be provided by the Department.

The PACT evaluation from March 8, 2013, shows that D.J.P.'s overall level of risk to re-offend is high.

The psychological evaluation performed on D.J.P. on March 15, 2013, by Daniel R. Altman, Ph.D. of Altman Psychological Services states that D.J.P. has a history of behavior problems that began around age thirteen or fourteen. He admitted breaking into a home with the intention of stealing items to sell, engaging in physical altercations every other week, lying by omitting essential details, and bringing a knife to school.

During the psychological evaluation, D.J.P. admitted using drugs beginning at age fourteen when he smoked marijuana every couple of weeks. At age fifteen, he smoked marijuana daily. At age sixteen, he used cocaine once or twice with the last use occurring when he failed a drug test. D.J.P. said that he consumes alcoholic beverages only on special occasions.

During the psychological evaluation, D.J.P. also admitted that there were two years when he did not attend school; he was getting into "trouble lots" and was working for a cousin to make money. D.J.P. had been in advanced placement classes in middle school and generally earned A's and B's. He admitted being sent to in-school suspension once or twice during the 2012–13

school year. He also admitted that he had been sent to the Juvenile Justice Alternative Education Program twice and that he had been suspended a number of times when he was younger because he had disrupted class and was disrespectful to a teacher.

The psychological evaluation states that Mother and grandmother often undermine D.J.P.'s probation officer.

At the end of the disposition hearing, Mother told the trial court that D.J.P. had nine days left of his original probation, that he had been clean for well over a year, that he goes to school, that he is really smart, and that he can do well.

### E. Trial Court's Orders

The trial court thereafter signed an order of detention, finding that it was contrary to D.J.P.'s welfare to continue to remain in Mother's home, that it was in D.J.P.'s best interest and the community's best interest that he be placed outside the home, and that reasonable efforts had been made to prevent or eliminate the need for D.J.P. to be removed from his home and to make it possible for him to return home. The trial court's order of detention states that the "parent/guardian/custodian" exhibits a pattern of being unable to provide adequate supervision, D.J.P. refuses to accept parental supervision, D.J.P. has a history of aggression towards others, and D.J.P. is currently on "probation/parole."

The trial court's judgment on the State's motion to modify disposition included findings that D.J.P. had violated the terms and conditions of his

12

probation by committing assault with bodily injury to a family member on February 22, 2013, and that it was in D.J.P.'s best interest that his probation be revoked and that he be committed to the TJJD.

The trial court's commitment order included findings that it is in D.J.P.'s best interests to be placed outside his home; that reasonable efforts were made to prevent or eliminate the need for his removal from his home and to make it possible for D.J.P. to return home; and that D.J.P., in his home, cannot be provided the quality of care and level of support and supervision that he needs to meet the conditions of probation. The trial court provided the following reasons why it is in D.J.P.'s best interest and why the best interest of society will be served by committing D.J.P to the care, custody, and control of the TJJD:

1) There are no facilities, services[,] or programs available which would meet the needs of the child;

2) The Court finds that the educational needs of the child can be met by the Texas Juvenile Justice Department;

3) The child has been found by the **COURT** to have violated Section **30.02 (FEL)** and **38.04 (MISD)** of the Texas Penal Code on or about **SEPTEMBER 27, 2011** and **NOVEMBER 12, 2011**[,] and was adjudicated delinquent on **DECEMBER 19, 2011**[,] and placed on probation on **DECEMBER 19, 2011**.

4) The child has been found by the **COURT**, by a preponderance of the evidence, to have violated the reasonable and lawful terms and conditions of probation by engaging in conduct that violates Section **22.01 (MISD)** of the Texas Penal Code, on or about **FEBRUARY 22, 2013**.

13

5) The Court finds that the child has been previously adjudicated delinquent for the following offenses on the following dates:

| Section of TPC/THSC | Date of Offense | Date of Adj/Motn to Modify | |
|---|---|---|---|
| 481.121 THSC MISD 95653-J | 04-16-12 | 05-03-12 | MTM |
| 481.121 THSC MISD 96438-J | 04-16-12 | 05-03-12 | MTM |

This appeal followed.

## III. STANDARD OF REVIEW

In a juvenile case, the trial court possesses broad discretion to determine a suitable disposition of a child who has been adjudicated to have engaged in delinquent conduct. *In re J.R.C.S.,* 393 S.W.3d 903, 914 (Tex. App.—El Paso 2012, no pet.). We do not disturb the juvenile court's findings absent an abuse of discretion. *Id.* The juvenile court does not abuse its discretion merely because it decides a matter differently than the appellate court would have in a similar situation. *Id.* We apply a two-pronged analysis to determine an abuse of discretion: (1) did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion? *Id.* A traditional sufficiency of the evidence review helps answer the first question, and we look to whether the trial court acted without reference to any guiding rules or principles to answer the second. *Id.*

## IV. TRIAL COURT DID NOT ABUSE ITS DISCRETION BY COMMITTING D.J.P. TO TJJD

In his sole issue, D.J.P. argues that the trial court abused its discretion because it sentenced him without reference to any guiding rules or principles. Specifically, D.J.P. argues that the record does not support the trial court's

14

findings that there are no facilities, services, or programs available that would meet his needs and that there was no testimony that his educational needs can be met by the TJJD.

Texas Family Code section 54.05(m)(1) states that if the court commits a child to the TJJD, the court shall include in the court's order a determination that (A) it is in the child's best interests to be placed outside the child's home; (B) reasonable efforts were made to prevent or eliminate the need for the child's removal from the child's home and to make it possible for the child to return home; and (C) the child, in the child's home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation. Tex. Fam. Code Ann. § 54.05(m)(1). D.J.P. concedes that the trial court made the mandatory commitment findings. *See id.* The State argues that D.J.P. has waived error because he does not challenge any of the section 54.05(m)(1) findings but instead challenges only two of the five subsidiary findings that the trial court made underlying its section 54.05(m)(1)(A)'s best-interest finding. Broadly construing D.J.P.'s sole issue as a challenge to the best-interest finding, we will analyze whether some evidence exists to support the best-interest finding. *See generally* Tex. R. App. P. 38.9.

With regard to the trial court's finding that there are no facilities, services, or programs available that would meet his needs, D.J.P. argues that he had been enrolled in the Can Academy during fall 2012, that he had attended regularly, and that he had performed well. The record, however, reveals that at the time of

the disposition hearing, the Can Academy was no longer an option for D.J.P. Both D.J.P. and Mother testified that the Can Academy has barred D.J.P. because of the new charge against him. The record also revealed that D.J.P. has been offered every available service, other than mental health services for which he does not qualify, and that he has exhausted the resources available in the community. The record thus supports the trial court's finding that it is in D.J.P.'s best interest to be placed outside the home because there are no facilities, services, or programs available to him in-home that would meet his needs. *See In re C.C.B.*, No. 02-08-00379-CV, 2009 WL 2972912, at *5 (Tex. App.—Fort Worth Sept. 17, 2009, no pet.) (mem. op.) (holding that trial court had ample evidence of juvenile's missed opportunities for rehabilitation and his continued threat to his community to support decision to commit juvenile to TYC and therefore did not abuse its discretion in committing juvenile to TYC); *In re B.M.*, No. 02-07-00153-CV, 2008 WL 281275, at *2 (Tex. App.—Fort Worth Jan. 31, 2008, no pet.) (mem. op.) (explaining that after attempts of probation while the juvenile remained in his home and probation while he was at a treatment center had failed, "TYC commitment was the only remaining option"); *In re J.B.*, No. 02-06-00396-CV, 2007 WL 2331023, at *2–3 (Tex. App.—Fort Worth Aug. 16, 2007, no pet.) (mem. op.) (affirming the trial court's commitment of a juvenile to TYC because, in part, "there was evidence that returning [the juvenile] to his home and placing him in outpatient treatment was not a viable solution due to [his] risk of reoffending").

16

While, as D.J.P. argues, there was little evidence presented at the disposition hearing about the educational programs available at TJJD or the treatment that he could receive there, the TJJD is statutorily required to provide an educational program that requires all residents to participate. 37 Tex. Admin. Code § 343.670 (2013) (Tex. Juvenile Justice Dep't, Educational Program). No evidence was presented that D.J.P. was exempt from or would not be able to participate in this statutorily required educational program.

Moreover, the record is replete with evidence that it was in D.J.P.'s best interest to be placed outside the home because the environment in the home was chaotic, Mother and D.J.P.'s grandmother had failed to provide proper supervision and had undermined the State's attempts to rehabilitate D.J.P., and D.J.P. did not respect Mother and did as he wished at home. We hold that the record contains sufficient evidence to support the trial court's commitment decision; therefore, the trial court did not abuse its discretion by sentencing D.J.P. to TJJD for an indeterminate period. *See In re J.D.T.*, No. 02-08-00390-CV, 2009 WL 976002, at *4–5 (Tex. App.—Fort Worth Apr. 9, 2009, no pet.) (mem. op.) (affirming the trial court's commitment of a juvenile to TYC because while he remained in his home, his probation was modified and extended twice due to aggressive behavior; he had assaulted his mother; and his mother lacked sufficient parenting skills); *In re E.G.H.*, No. 02-06-00381-CV, 2007 WL 2067734, at *3 (Tex. App.—Fort Worth July 19, 2007, no pet.) (mem. op.) (holding that given appellant's juvenile history, his need for structure, the probation officer's

and staffing committee's opinions that his home lacked discipline when his grandfather was not home, and the many services offered to appellant in the past of which he did not take advantage, trial court did not abuse its discretion by committing appellant to TYC). We overrule D.J.P.'s sole issue.[12]

## V. CONCLUSION

Having overruled D.J.P.'s sole issue, we affirm the trial court's judgment.

PER CURIAM

PANEL: WALKER, J.; LIVINGSTON, C.J.; and DAUPHINOT, J.

DELIVERED: January 16, 2014

---

[12]To the extent that D.J.P.'s statements in the "restated argument" paragraph of his brief may be construed as a challenge to the sufficiency of the evidence to support the trial court's other section 54.05(m)(1) findings, we point out that the facts in the record, as recited in this opinion, constitute some evidence to support the trial court's other section 54.05(m)(1) findings. We overrule any sufficiency challenges by D.J.P., if his brief is construed as making them.